# No. 14-3978-ag

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**NATIONAL LABOR RELATIONS BOARD**

**Petitioner**

**v.**

**NEWSPAPER AND MAIL DELIVERERS' UNION OF**
**NEW YORK AND VICINITY**

**Respondent**
_____

**ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

**BRIEF FOR**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

**JILL A. GRIFFIN**
*Supervisory Attorney*

**BARBARA A. SHEEHY**
*Attorney*

**National Labor Relations Board**
**1099 14th Street, N.W.**
**Washington, D.C. 20570**
**(202) 273-2949**
**(202) 273-0094**

**RICHARD F. GRIFFIN, JR.**
  *General Counsel*
**JENNIFER ABRUZZO**
  *Deputy General Counsel*
**JOHN H. FERGUSON**
  *Associate General Counsel*
**LINDA DREEBEN**
  *Deputy Associate General Counsel*

**National Labor Relations Board**

# TABLE OF CONTENTS

**Headings**                                                                          **Page(s)**

Statement of jurisdiction ....................................................................................1

Relevant statutes and regulations......................................................................2

Statement of the issues presented .....................................................................2

Concise statement of the case ...........................................................................3

I.   Procedural history .......................................................................................3

II.  The Board's findings of fact.......................................................................5

    A.  The Post, C&S and NMDU .........................................................5

    B.  Historical contractual provisions under multiemployer association
        agreements ...................................................................................6

    C.  The C&S/Times cases .................................................................9

        1.  The 1999 C&S contract ......................................................9

        2.  The Times announces the impending closure of C&S; NMDU
            and the Times negotiate a closure agreement and side letter with
            priority preferences based on union membership and employment
            with union-signatory employers .......................................10

        3.  The Times implements the closure agreement ..................12

    D.  The Post cases .............................................................................12

        1.  The 2003 NMDU-Post agreement contains an assignment
            hierarchy harkening back to historical practices, provides for
            the filling of RSH and Group vacancies, and requires the payment
            of union fees.......................................................................12

# TABLE OF CONTENTS

**Headings – Cont'd**                                                        **Page(s)**

    2.  The 2003 NMDU-Post agreement permits certain transfers to the Post's Group 1 list ........................................................15

    3.  In 2008, NMDU refuses to convene the Adjustment Board; C&S ceases operations in early 2009; the Adjustment Board names many C&S employees to the Post's Group 1 list ...................15

    4.  The adverse effects resulting from the Adjustment Board orders ......17

    5.  NMDU expels Daniel Altieri from NMDU and threatens his employment based on alleged dues arrearage ....................................18

III.  The Board's conclusions and order .................................................19

Summary of argument.....................................................................23

Standard of review ........................................................................26

Argument........................................................................................27

  I.  The Board is entitled to summary enforcement of the uncontested portions of its Order regarding NMDU's threats to Daniel Altieri ..............27

  II.  Substantial evidence supports the Board's findings that NMDU violated the Act by causing and attempting to cause the Post, the Times and C&S to discriminate against certain employees by giving priority preferences based on union membership and prior employment with union-signatory employers...........................................................28

    A.  Applicable principles ...........................................................29

      1.  The Act prohibits a union from discriminating based on nonmember status ..........................................................29

      2.  The Act prohibits a union from discriminating within a single unit based on union seniority ..................................31

# TABLE OF CONTENTS

**Headings – Cont'd**                                                **Page(s)**

B.  The Board reasonably determined that NMDU violated the Act with respect to Post employers .....................................................32

    1.  Substantial evidence supports the Board's finding that NMDU maintained and enforced agreements that gave priority preferences to nonunit employees based on union considerations ................................................................32

    2.  Substantial evidence supports the Board's finding that NMDU granted unlawful priority hiring preference to individuals on the Group 2 list......................................................34

    3.  Substantial evidence supports the Board's finding that NMDU unlawfully prevented the promotion of unit employees................35

    4.  Substantial evidence supports the Board's finding that NMDU unlawfully conferred a priority hiring preference to former C&S RSHs ...................................................................36

C.  The Board reasonably determined that NMDU violated the Act with respect to certain C&S and former C&S unit employees..............37

D.  The Board's decision is consistent with Board precedent .....................39

    1.  The Board properly distinguished *Teamsters Local Union 896*................................................................................39

    2.  The Board's Decision is consistent with *Interstate Bakeries Corp.* ............................................................................41

E.  The Board's decision is distinguishable from *NLRB v. New York Typographical Union No. 6* and *NLRB v. Whiting Milk Corp.* .............43

F.  NMDU's remaining arguments are meritless.......................................48

iii

# **TABLE OF CONTENTS**

**Headings – Cont'd**                                                    **Page(s)**

III. The Board reasonably rejected NMDU's affirmative defense that the unfair-labor-practice charges concerning the C&S buyouts were time-barred under Section 10(b) of the Act ........................................................52

IV. The Board reasonably determined  that NMDU failed to give unit employees at the Post and C&S sufficient notice under the Supreme Court decisions of *General Motors* and *Beck* ................................................55

    A. Union-security agreements ...................................................55

    B. Duty of fair representation ...................................................57

    C. NMDU breached its duty of fair representation to the unit employees its represents at C&S and the Post ........................................................58

Conclusion ...............................................................................................61

iv

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbey's Transp. Servs., Inc. v. NLRB,*
   837 F.2d 575 (2d Cir. 1988)................................................26

*Aeronautical Industrial District Lodge 727 v. Campbell,*
   337 U.S. 521 (1949)......................................................48

*Arvin Auto.,*
   285 NLRB 753 (1987) ....................................................47

*Auto Workers Local,*
   271 NLRB 1411 (1984), *enforced*
   777 F.2d 1131 (6th Cir. 1985) ...........................................53

*Bowen Products Corp.,*
   113 NLRB 731 (1955) ....................................................54

*California Saw & Knife Works,*
   320 NLRB 224 (1995) ..........................................57, 58, 59

*Cibao Meat Prods., Inc. v. NLRB,*
   547 F.3d 336 (2d Cir. 2008)..............................................27

*Communications Workers v. Beck,*
   487 U.S. 735 (1988) .................................................19, 56

*Directors Guild of Am., Inc.,*
   198 NLRB 707 (1972), *enforced,*
   494 F.2d 692 (9th Cir. 1974) ......................................30, 37, 50

*E.J. Brach Corp.,*
   324 NLRB 1193 (1997) ...................................................59

*Ford Motor Co. v. Huffman,*
   345 U.S. 330 (1953)......................................................46

*Ford Motor Co. v. NLRB,*
   441 U.S. 488 (1979)......................................................43

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                    **Page(s)**

*Humphrey v. Moore*,
 375 U.S. 335 (1964) ...................................................................48

*IATSE, Local 659*,
 197 NLRB 1187 (1972) ................................................... 30, 34, 37, 50

*Interstate Bakeries Corp.*,
 357 NLRB No. 4, 2011 WL 2596443 (June 30, 2011), *enforced*,
 488 Fed. App'x 280 (10th Cir. 2012) ...................................... 31, 41, 42

*Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*,
 133 F.3d 1012 (7th Cir. 1998).................................................57

*Int'l Photographers of Motion Picture Inds. v. NLRB*,
 477 F.2d 450, 1973 WL 21501, *1 (D.C. Cir. Apr. 27, 1973) ....................... 49-50

*Jones v. Trans World Airlines*,
 495 F.2d 790 (2d Cir. 1974).................................................. 48-49

*L. D. Kichler Co.*,
 335 NLRB 1427 (2001) ......................................................58

*Local Lodge No. 1424 v. NLRB*,
 362 U.S. 411 (1960) ........................................................53

*Local Union No. 749, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths,
 Forgers & Helpers v. NLRB*,
 466 F.2d 343 (D.C. Cir. 1972) ..............................................56

*Lummus Co. v. NLRB*,
 339 F.2d 728 (D.C. Cir. 1964) ..............................................50

*Marquez v. Screen Actors Guild, Inc.*,
 525 U.S. 33 (1998)..........................................................57

*NLRB v. Bakery Workers Local 50*,
 339 F.2d 324 (2d Cir. 1964)..................................................29

vi

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                  **Page(s)**

*NLRB v. Caval Tool Div.*,
  262 F.3d 184 (2d Cir. 2001)...................................................................26

*NLRB v. Clark Manor Nursing Home Corp.*,
  671 F.2d 657 (1st Cir. 1982) ...............................................................27

*NLRB v. G & T Terminal Packaging Co.*,
  246 F.3d 103 (2d Cir. 2001)...................................................................26

*NLRB v. General Motors Corp.*,
  373 U.S. 734 (1963) ..................................................................... 19, 56

*NLRB v. Glover Bottled Glass Corp.*,
  905 F.2d 681 (2d Cir. 1990).....................................................................52

*NLRB v. Milk Drivers & Dairy Employees*,
  531 F.2d 1162 (2d Cir. 1976)........................................................... 50-51

*NLRB v. Natural Gas Util. Dist.*,
  402 U.S. 600 (1971).....................................................................46

*NLRB v. New York Typographical Union No. 6*,
  632 F.2d 171 (2d Cir. 1980)................................................... 43, 44, 45

*NLRB v. Pub. Serv. Elec. & Gas Co.*,
  157 F.3d 222 (3d Cir. 1998)...................................................................52

*NLRB v. Whiting Milk Corp.*,
  342 F.2d 8 (1st Cir. 1965), *reversing*
  145 NLRB 1035 (1964) ...............................................................43, 45

*Newspaper & Mail Deliverers' Union*,
  227 NLRB 608 (2002) ...........................................................................34

vii

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                      **Page(s)**

*Painter's Local Union No. 77,*
  222 NLRB 607 (1976) ...................................................................30

*Patterson v. Newspaper & Mail Deliverers' Union,*
  514 F.2d 767 (2d Cir. 1975) *affirming*
  384 F. Supp. 585 (S.D.N.Y. 1974) ............................................ 50-51

*Potlatch Forests, Inc.,*
  87 NLRB 1193 (1949) *enforcement denied on other grounds,*
  189 F.2d 82 (9th Cir. 1951) .........................................................53

*Radio Officers' Union v. NLRB,*
  347 U.S. 17 (1954) ........................................................ 29, 42-43, 50

*Road Sprinkler Fitters Local Union No. 669 v. NLRB,*
  778 F.2d 8 (D.C. Cir. 1985) .........................................................49

*Stage Emps. Local 659,*
197 NLRB 1187, 1191 (1972), *enforced mem.*
479 F.2d 450 (D.C. Cir. 1973) .....................................................32

*Seafarers' Int'l Union,*
  244 NLRB 641 (1979) ......................................................... 29-30, 34

*Teamsters Local 357 v. NLRB,*
  365 U.S. 667 (1961) ....................................................................50

*Teamsters Local 435,*
  317 NLRB 617 (1995), *enforced,*
  92 F.3d 1063 (10th Cir. 1996) .....................................................31

*Teamsters Local 480,*
  167 NLRB 920 (1967) *enforced,*
  409 F.2d 610 (6th Cir. 1969) ................................................... 31, 39

*Teamsters Local Union 896,*
  296 NLRB 1025 (1989) ......................................................39,40, 41,53

# <u>TABLE OF AUTHORITIES</u>

**Cases-Cont'd**                                                               **Page(s)**

*Torrington Extend-A-Care Emp. Ass'n v. NLRB*,
  17 F.3d 580 (2d Cir. 1994)....................................................................27

*United States v. Donnelly*,
  397 U.S. 286 (1970) .........................................................................47

*United States v. Mendoza*,
  464 U.S. 154 (l984)..........................................................................47

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) .........................................................................26

*Vaca v. Sipes*,
  386 U.S. 171 (1967) .........................................................................57

*Whiting Milk Corp.*,
  145 NLRB 1035 (196) *enforcement denied*,
  342 F.2d (1st Cir. 1965) ...................................................................45

*Woodlawn Farm Dairy Co.*,
  162 NLRB 48 (1966) ........................................................................39

**Statutes:**                                                                 **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ........................................... 28,29,31, 36,54,50,53,54,55
Section 8(a)(3) (29 U.S.C. § 158(a)(3)).......................................................... 19,28,54
Section 8(b)(1)(A) (29 U.S.C. § 158(b)(1)(A) ......... 19,20,21,23,24,26,28,29,31-54
Section 8(b)(2) (29 U.S.C. § 158(b)(2)) ........................... 19,20,21,23,24,28, 29,38
Section 8(c) (29 U.S.C. § 158(c)) .................................................................... 25,58
Section 10(a) (29 U.S.C. §160(a)) ........................................................................1,2
Section 10(b) (29 U.S.C. § 160(b))....................................................... 3,50,51,52,53
Section 10(c) (29 U.S.C. § 158(c)) ................................................................... 25,58
Section 10(e) (29 U.S.C. § 160(e)) ...................................................................2,25
Section 10(f) (29 U.S.C. § 160(f)) ....................................................................2,44

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————————————

## No. 14-3978-ag

————————————————

## NATIONAL LABOR RELATIONS BOARD

### Petitioner

### v.

## NEWSPAPER AND MAIL DELIVERERS' UNION OF
## NEW YORK AND VICINITY

### Respondent

————————————————————

## ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

————————————————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

————————————————————

## STATEMENT OF JURISDICTION

This case is before the Court on the application of the National Labor

Relations Board ("the Board") to enforce its Order issued against the Newspaper

and Mail Deliverers' Union of New York and Vicinity ("NMDU") finding that it

committed multiple violations of the National Labor Relations Act, as amended

(29 U.S.C. §§ 151 et seq.) ("the Act"), in its dealings with The New York Post

("the Post"), The New York Times ("the Times"), and City and Suburban Delivery

Systems, Inc. ("C&S"). The Board had jurisdiction under Section 10(a) of the Act (29 U.S.C. § 160(a)). The Board's Decision and Order issued on August 21, 2014, and is reported at 361 NLRB No. 26. (SPA 44-82.)[1]

The Court has jurisdiction over this proceeding under Section 10(e) and (f) of the Act (29 U.S.C. § 160(e) and (f)) because the Board's Order is final with respect to all parties. Venue is proper because the unfair labor practices occurred in New York City, New York. The Board filed its application for enforcement on October 23, 2014. It was timely because the Act places no time limit on such filings.

## RELEVANT STATUTES AND REGULATIONS

The relevant statutory provisions are found in the Addendum.

## STATEMENT OF THE ISSUES PRESENTED

1.    Is the Board entitled to summary enforcement of the uncontested portions of its Order regarding NMDU's threats to Daniel Altieri?

2.    Does substantial evidence support the Board's findings that NMDU violated the Act by causing and attempting to cause the Post, the Times, and C&S

---

[1]  "A." refers to the joint appendix, "SPA" refers to the special appendix, and "S.A." refers to the Board's supplemental appendix filed simultaneously with this brief.  "Br." refers to NMDU's opening brief.  References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

to discriminate against certain employees by giving priority preferences based on union membership and prior employment with union-signatory employers?

3.     Did the Board reasonably reject NMDU's affirmative defense that the unfair-labor-practice charge concerning the C&S buyouts and transfers was time-barred under Section 10(b) of the Act?

4.     Did the Board reasonably determine that NMDU failed to give unit employees at the Post and C&S sufficient notice of their rights under the Supreme Court decisions of *General Motors* and *Beck*?

## CONCISE STATEMENT OF THE CASE

## I.     PROCEDURAL HISTORY

Based on unfair-labor-practice charges filed by several individual employees in October 2008, all of which related to events and transactions involving the Post, the Board's General Counsel issued a consolidated complaint alleging that NMDU violated the Act by maintaining and enforcing agreements that conferred priority preferences based on NMDU membership and employment with a union-signatory employer;[2] by causing or attempting to cause the Post to discriminate against employees in the Post bargaining unit by giving priority preferences based on NMDU membership and employment with a union-signatory employer; and by failing to inform Post employees of their rights under *NLRB v. General Motors*

---

[2] "Union-signatory employer" herein refers to those employers with NMDU contracts.

*Corp.*, 37 U.S. 734 (1963) and *Communications Workers v. Beck*, 487 U.S. 735 (1988).

On January 26, 2011, based on unfair-labor-practice charges filed by additional charging parties between December 2008 and May 2009, all of which arose out of a set of facts relating to the Times and one of its wholly-owned subsidiaries, C&S, the Board's General Counsel issued a consolidated complaint alleging that NMDU had violated the Act by causing or attempting to cause C&S and the Times to discriminate against certain employees in the respective bargaining units by entering into a closure agreement that granted unlawful employment preferences.  On April 25, the General Counsel amended the complaint, based on additional charges, to include allegations that NMDU had failed to inform C&S employees of their rights under *General Motors* and *Beck* and had threatened to bar a former employee from employment based on alleged union dues arrearage.

An administrative law judge held a six-day hearing on both consolidated complaints.  On February 8, 2012, the judge issued a decision finding merit to the allegations.  (SPA 1-43.)  NMDU and the General Counsel sought Board review and filed exceptions to the judge's decision.  (SPA 44.)

On August 21, 2014, the Board rejected NMDU's exceptions and agreed with the judge that NMDU had violated the Act.  (SPA 44-82.)  The Board also

found merit to some of the General Counsel's exceptions and, accordingly, modified the judge's decision and recommended order.

## II.    THE BOARD'S FINDINGS OF FACT

### A.    The Post, C&S, and NMDU

NYP Holdings, Inc. d/b/a New York Post, a subsidiary of News Corporation, publishes the *New York Post*, *The Wall Street Journal*, *Barron's*, and other community newspapers out of a printing facility in the Bronx. Publications printed at the Bronx facility are distributed by employees employed by the Post. (SPA 11; A. 42-43.)

C&S, a wholly owned subsidiary of The New York Times Company, operated several facilities in New York and New Jersey and engaged in wholesale distribution of *The New York Times* and other publications. C&S was created from four wholesale distributors acquired by the Times between 1992 and 1996. (SPA 16; A. 137-40, 407, 438, 461.)

NMDU is a labor organization representing employees in the newspaper industry in the New York City metropolitan area. At the Post, NMDU represents a unit of employees at the Bronx print center, which consists of drivers, route men, chauffeurs, clerks, floor men, and hi-lo operators. At C&S, NMDU represented a unit of drivers, floormen, and foremen. (SPA 6, 50, 52; A. 137-38, 262, 406-09, 439, 587.)

**B.  Historical Contractual Provisions Under Multiemployer Association Agreements**

In 1953, in the context of multiemployer bargaining, NMDU and the publishing employers and wholesaler employers with which it had contracts ("union-signatory employers"), agreed to a hierarchal structure for work assignments and hiring.  Each union-signatory employer had a group of steady employees called regular situation holders ("RSHs"), who were required to become union members and who worked "day in and day out throughout the year."  The publishing employers needed to employ additional employees who would show up ("shape") for work and who received assignments when the regular workforce was insufficient.  The contract, therefore, created rosters of extra employees for these work assignments and divided extras into one of four groups.  After RSHs received their assignments, extras would bid daily for the remaining work according to their placement in one of the four groups and their seniority within that group.  (SPA 8; S.A. 392-93.)

- Group 1 originally consisted of former RSHs in the "industry," which meant any RSH who had worked for any union-signatory employer within NMDU's jurisdiction.  In 1974, as a result of a settlement agreement, Group 1 also included former Group 3 extras who had been promoted to Group 1. Individuals on the Group 1 list were required to become union members.

- Group 2 consisted of *any* RSH or Group 1 extra who was currently employed by any union-signatory employer within NMDU's jurisdiction. Individuals on the Group 2 list were required to become union members.

- Group 3 consisted of individuals who regularly shaped for work at a particular employer and who obtained regular work over a given period of time. Group 3 individuals needed to work five days/nights per week and shape 6 days/nights per week. Group 3 was ineligible for union membership, but paid regular fees to NMDU, and their conditions of employment were defined by the collective-bargaining agreement NMDU had with their union-signatory employer.

- Group 4 consisted of "casual" employees. Group 4 was ineligible for union membership, but paid regular fees to NMDU, and their wages and conditions of employment were defined by the collective-bargaining agreement NMDU had with their union-signatory employer.

(SPA 9-10, 45; A. 910-59, S.A. 393.)

Seniority under this multiemployer agreement structure depended on the particular group and was often keyed to union membership date. For instance, Group 2, a list maintained by NMDU, was ordered according to length of time as an RSH or Group 1 individual working for *any* union-signatory employer. This seniority order was based on the fact that once an individual joined the Group 1

list, NMDU assigned him an industry-wide "priority number" that determined his seniority among the employees of *all* union-signatory employers. As such, placement on the Group 2 list was coextensive with the date that employees became a union member. A lower industry-wide number corresponded to greater seniority. Individuals on the Group 3 and 4 lists were not eligible to be union members, so their seniority was generally determined by the length of time within an employer's own workforce. (SPA 9-10, 45; A. 108-09, 170.)

The employers who were covered by the multiemployer agreements assigned work as follows. First, RSHs would notify their employer by a time certain that they were unavailable for work that day. The employer—then knowing its work assignment needs—would post a shape sheet; members of the Group 2 list would indicate their priority number (lower number corresponding to higher seniority). The individual employers would then make assignment decisions based on group hierarchy. Assignments were first offered to Group 1 and then Group 2, both of which exclusively included union members. If work still remained, members of Group 3 and 4 would receive assignments. Under a multiemployer agreement, this type of seniority structure, which accorded priority hiring and assignment preferences to union members, is not inconsistent with the Act. (SPA 45; A. 107-10.)

The Post and the Times belonged to the Publishers' Association, while some of C&S's predecessor companies (but not C&S itself) were members of the Suburban Wholesalers' Association. Both of these employer associations had bargained with NMDU. Eventually, some employers covered by the resulting multiemployer bargaining agreements withdrew from the respective associations and bargained individually with NMDU for a separate collective-bargaining agreement covering just that employer's employees. The Post, for instance, withdrew from the Publishers' Association in 1975, and from that point forward has bargained separately with NMDU for a contract covering only Post employees. Declining membership led the Publishers' Association to go defunct in 1984. The Suburban Wholesalers' Association had ceased to exist by the time C&S was created between 1992 and 1996. All surviving publishers and wholesalers thereafter negotiated separate collective-bargaining agreements with NMDU. (SPA 12 16; A. 44-45, 138, 157-58, 656, S.A. 10-329.)

## C. The C&S/Times Cases

### 1. The 1999 C&S contract

In 1999, NMDU and C&S bargained a single overall contract covering C&S's six facilities effective until March 30, 2008, which the parties then extended until March 30, 2020. The C&S contract provided for two categories of employees—RSHs and extras. Seniority for RSHs within C&S was determined by

"make-steady date," which is the date on which an employee became an RSH with

C&S or with a C&S predecessor company. An employee's make-steady date is

generally different from his industry-wide priority number; the latter corresponds

to the date an individual became a union member at any union-signatory employer.

Further, under the agreement, all extras were listed on a single list. At the top of

the list were former RSHs and Group 1 extras in industry-wide seniority order,

followed by current RSHs employed by another union-signatory employer in

industry-wide seniority order. (SPA 16, 47; A. 139-42, S.A. 57.)

C&S and NMDU incorporated a June 8, 1999 side letter into the agreement,

which obligated C&S employees to pay union dues or agency fees. (SPA 49; S.A.

71.) There is no evidence that NMDU provided annual *Beck* or *General Motors*

notices to any C&S employee.

> **2.** **The Times announces the impending closure of C&S; NMDU and the Times negotiate a closure agreement and side letter with priority preferences based on union membership and employment with union-signatory employers**

On September 8, 2008, the Times announced that C&S would close

operations. On November 20, NMDU and the Times reached an agreement

concerning the closure of C&S, under which the Times agreed to hire 65 C&S

RSHs and add them to the end of the Times' RSH seniority list ("endtail") and to

pay a $100,000 buyout to each of 140 C&S RSHs who opted to leave the industry.

The closure agreement also provided that the remaining RSHs would receive an eight-week severance package whereas other eligible C&S employees would receive a four-week severance package. (SPA 1, 47; A. 142, 760-87.)

Elections under the closure agreement and endtailing to the Times' RSH list were based on "seniority" as defined in a November 20 side agreement executed simultaneously with the closure agreement. That agreement defined seniority as "industry-wide priority," which was based on length of union membership with any union-signatory employer and not an RSH's seniority date with C&S. Accordingly, the C&S employee with the most seniority was the individual who first became an RSH or joined a Group 1 list with *any* union-signatory employer, because these actions (becoming an RSH or joining a Group 1 list) trigger eligibility for union membership. The industry-wide priority number therefore corresponds to the date an individual joined NMDU pursuant to a union-security clause with any union-signatory employer. In addition to industry-wide seniority affecting the order in which buyout and transfer requests were honored, former C&S employees who transferred to the Times were endtailed to the RSH list in order of industry-wide priority number. And because seniority status among RSHs affects terms and conditions of employment, the use of industry-wide seniority gave an advantage to those who worked with other union-signatory employers over

former C&S employees whose seniority was measured only by their years of
employment with C&S.  (SPA 19, 47; A. 770.)

### 3. The Times implements the closure agreement

On December 10, C&S notified eligible employees that they could elect a
buyout or a transfer, that C&S would close on January 4, 2009, and that they had
until January 26 to make a selection.  In February, pursuant to the closure
agreement, the Times distributed checks to those C&S employees who elected the
buyout and added 65 C&S employees to the bottom of the Times RSH list.  Before
completing the buyout payments, a question arose regarding whether six
individuals should have had their buyout elections accepted.  The Times therefore
set aside money for six individuals until the issue was resolved.  (SPA 18-19; A.
149-50, S.A. 330-87.)

### D. The Post Cases

#### 1. The 2003 NMDU-Post Agreement contains an assignment hierarchy harkening back to historical practices, provides for the filling of RSH and Group vacancies, and requires the payment of union fees

The current contract between NMDU and the Post is the 2003-2010
agreement, as modified by 2006 and 2008 memoranda of understanding ("2003
NMDU-Post agreement"), which expires December 15, 2015.  During negotiations
for the 2003 NMDU-Post agreement, the parties implemented a seniority system
similar to the previous industry-wide system negotiated with the multiemployer

associations.  They defined the four groups who would be assigned work after RSHs as follows:

- Group 1 (unemployed extras): All Group 1 and former RSHs in the industry (i.e., union-signatory employers who use delivery employees within the greater New York metropolitan area).  To retain Group 1 status, individuals must shape six shifts per week or work five shifts per week.  These individuals are required to become union members.

- Group 2 (industry extras): RSHs and Group 1 employed by any union-signatory employer.  These individuals are required to become union members.

- Group 3 (regular extras): "steady shapers" who signify their intention to and do shape regularly.  To retain Group 3 status, individuals must shape six shifts per week or work five shifts per week.  These individuals are ineligible for union membership.

- Group 4 (casuals): persons who are not connected with the industry but who wish to shape from time to time.  These individuals are ineligible for union membership.

(SPA 12, 46; A. 581-654.)  With limited exception, individuals are prohibited from being listed in Groups 1 or 3 at more than one newspaper, and an individual may only hold one RSH position.  (A. 599-600.)

Under the 2003 NMDU-Post agreement, vacant RSH positions are filled automatically from the top of the Group1 list by order of industry-wide union priority number and then, if vacancies remain, from the Group 3 list. The filling of Group 1 and 3 vacancies requires majority action from the Adjustment Board, a contractually-created body, comprised of two employer and two union representatives. The Adjustment Board "shall have the authority and responsibility of adding to, deleting from, or changing the lists." (A. 599.) It "process[es] applications for listing in Groups 1 and 3," (A. 599), and issues orders adding specific individuals to the various groups, which are binding on the parties. Generally, the Adjustment Board fills Group 1 vacancies with Group 3 individuals. (SPA 12-13, 46 n.6; A. 51-54, 599, 617.)

Additionally, the 2003 NMDU-Post agreement contains a union-security clause that requires union membership in some form and imposes a financial obligation on RSHs and individuals in Group 1. That clause also imposes a financial obligation on individuals in Groups 3 and 4, who are not eligible for union membership. There was no evidence that NMDU provided annual notices under *Beck* and *General Motors* beyond a 2003 union bulletin. (SPA 13, 23, 49; A. 591.)

### 2.  The 2003 NMDU-Post agreement permits certain transfers to the Post's Group 1 list

The 2003 NMDU-Post agreement includes two provisions that allow employees of other union-signatory employers to transfer to the Post under certain circumstances.  First, an RSH who has held that position continuously for five years "shall have the right to apply for Group 1 listing with a [union-signatory employer]."  (SPA 46; A. 599-600.)  Second, the agreement incorporates an October 29, 2003 side letter, which provides in relevant part that, if certain publishers or wholesalers ceased to operate, the Post "shall add to its Group 1 list, RSHs and bona fide Group 1 Extras who, through no fault of their own, lose their employment as a result."  (SPA 13, 46; A. 648.)

### 3.  In 2008, NMDU refuses to convene the Adjustment Board; C&S ceases operations in early 2009; the Adjustment Board names many C&S employees to the Post's Group 1 list

In February 2008, there were 7 openings out of 24 positions on the Post's Group 1 list.  Several months later, the vacancies increased to 10.  On July 9, the Post's director of distribution contacted NMDU to request a meeting of the Adjustment Board to fill the vacancies consistent with the contract.  NMDU, aware that C&S was likely to go out of business, wanted to preserve vacancies on the Post's Group1list for displaced C&S employees.  (SPA 14-16; A. 56-59, S.A. 1, 2.)  Accordingly, the next day, NMDU responded that "there is an industry-wide 'Freeze' on all One Lists not just the New York Post."  (SPA 46; A. 711.)

According to NMDU, the "freeze" was based, in part, on the "economic uncertainty throughout [the publishing] industry." (SPA 46; A. 711.) NMDU informed the Post that it saw "no need to fill these vacancies on the One list throughout the industry at this time" and refused to convene an Adjustment Board meeting. (SPA 46; A. 711.)

On January 4, 2009, C&S went out of business. On January 11, the Post promoted the 14 individuals on the Group 1 list to RSH, which left all 24 positions on the Group 1 list vacant. On February 18, the Adjustment Board met and expanded the Post's Group 1 list, issuing an order naming 75 former C&S employees to that list. The February 18 order specifically referenced the October 23, 2003 side letter. On August 5, the Adjustment Board issued two more orders, again referencing the October 29, 2003 side letter, naming another 13 displaced C&S employees and 29 Group 3 and 4 individuals to the Group 1 list. The former C&S employees were placed on the Group 1 list ahead of all the Group 3 and 4 individuals who were elevated to the list. On January 10 and August 17, 2010, the Adjustment Board signed two more orders, again invoking the October 29, 2003 side letter, naming 9 former C&S employees to the bottom of the Post's Group 1 list and then 3 Group 4 individuals. (SPA 15, 16 n.13, 46-47; A. 59-66, 712-13, S.A. 3-7.)

To be clear, seniority on the Post's new Group 1 list was based on industry-wide priority union numbers, which as detailed above, is the number NMDU gives to employees when they become eligible for union membership at any union-signatory employer. Seniority was not based on years of employment with the Post.

### 4. The adverse effects resulting from the Adjustment Board orders

The Adjustment Board orders, which enforced the transfer provision of the 2003 NMDU-Post agreement and the October 29, 2003 side letter, had several adverse consequences. Namely, certain Group 1 individuals experienced delayed promotions and less favorable working conditions, and individuals in Groups 3 and 4 suffered delayed potential for promotions and diminished potential work assignments. In 2010 and 2011, after the Adjustment Board had ordered numerous C&S employees to be added to the Group 1 list, the Post promoted 22 Group 1 individuals to RSH, who are guaranteed five shifts per week and superior wages and benefits. Each individual on the Post's Group 1 list who had been elevated to that list from Group 3 had greater seniority with the Post than every former C&S employee, but none of them were promoted. A former C&S employee received each of the 22 promotions to RSH, because they were the top names on the Group 1 list pursuant to NMDU's industry-wide seniority system. Moreover, the relative seniority position of people on the Post's Group 1 list—which placed former C&S

employees above the Post's own employees—affected the order in which people are assigned to daily jobs and other aspects of their work, such as vacation preferences.  (SPA 16; A. 45, 70, S.A. 8-9.)

With respect to the effects on Groups 3 and 4, the C&S employees added to the Group 1 list "bumped all of the people who had been employees on the Post's Group 3 list, many of whom remained on that list."  (SPA 16.)  These "bumped" Group 3 individuals were ineligible for promotions to the Group 1 list until the greatly expanded list had fillable vacancies.  Lastly, the individuals in the Post's Groups 3 and 4 would obtain work only if sufficient work remained after assignments are offered to the Group 1 list, which were expanded greatly to include many former C&S employees, and then the Group 2 list.  With the addition of many more employees ahead of them, Group 3 and 4 faced diminished work assignment.  (SPA 16.)

### 5. NMDU expels Daniel Altieri from NMDU and threatens his employment based on alleged dues arrearage

Prior to January 2009, Daniel Altieri was an RSH employed by C&S and was required to pay the periodic dues that are ordinarily required of membership.  After C&S closed on January 4, Altieri started work for another newspaper employer.  (SPA 23; A. 181.)  On August 10, NMDU informed Altieri that he was "expelled from NMDU because [he was] 6 months or more in arrears in union dues."  (SPA 23; A. 902-04.)  The letter warned further that as a result of his

expulsion, he could "lose all claims to employment at [his] employer or at any

employer that is governed by a collective-bargaining agreement between the

[Union] and those employers."  (SPA 23; A. 902-04.)

## III.   THE BOARD'S CONCLUSIONS AND ORDER

The Board (Chairman Pearce and Members Miscimarra and Schiffer)

determined, in agreement with the administrative law judge, that NMDU violated

Section 8(b)(1)(A) and (2) of the Act (29 U.S.C. § 158(b)(1)(A) and (2)) by

causing or attempting to cause the Post to discriminate against certain unit

employees in violation of Section 8(a)(3) of the Act (29 U.S.C.§ 158(a)(3)) by

giving a priority hiring preference to nonunit individuals based on their union

membership and their employment with a union-signatory employer.  (SPA 48.)

Also in agreement with the judge, the Board found that NMDU violated Section

8(b)(1)(A) and (2) of the Act by refusing to elevate employees from the Post's

Group 3 list to fill vacancies on the Group 1 list and by failing to provide Post

employees notice of their right under *NLRB v. General Motors Corp.*, 373 U.S.

734 (1963), to be and remain nonmembers, and of the rights of nonmembers under

*Communications Workers v. Beck*, 487 U.S. 735 (1988), to object to paying for

union activities not germane to NMDU's duties as bargaining agent and to obtain a

reduction in dues and fees for such activities, while maintaining and enforcing a

union-security clause.  (SPA 48, 49.)  The Board found further that NMDU

violated Section 8(b)(1)(A) and (2) by maintaining and enforcing agreements at the Post that granted priority hiring preferences to nonunit individuals based on membership in NMDU and employment with a union-signatory employer.  (SPA 48 n.9.)

With respect to C&S and the Times, the Board found, in agreement with the administrative law judge, that NMDU violated Section 8(b)(1)(A) and (2) of the Act by causing and attempting to cause C&S to discriminate against C&S unit employees by giving a priority employment preference to C&S unit employees based on their union membership and prior employment with a union-signatory employer and by causing and attempting to cause the Times to discriminate against former C&S unit employees by giving a priority employment preference to certain former C&S employees based on their membership in NMDU and prior employment with a union-signatory employer.[3]  (SPA 48.)  The Board found further, in agreement with the judge, that NMDU violated Section 8(b)(1)(A) of the Act by threatening to interfere with the employment of Daniel Altieri, a former C&S employee, with any union-signatory employer based on Altieri's alleged union dues arrearage.  (SPA 49-50)  Additionally, the Board found that NMDU

---

[3] The Board also found (SPA 48 n.11) that three former C&S employees—Enrique Grado, Richard Atkins, and Djevalin Gojani—should have their make-steady dates changed to May 4, 1998.

violated Section 8(b)(1)(A) of the Act by failing to provide C&S employees notice of their right under *General Motors* and *Beck*.  (SPA 49)

The Board's Order  requires NMDU to cease and desist from the unfair labor practices found and, in any like or related manner, restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act. (SPA 56.)  The Board affirmatively ordered NMDU to revise the Post seniority lists so that those C&S employees hired by the Post will have seniority only from the date of their employment at the Post and other Post employees who have worked longer at the Post are given greater seniority status either as RSHs or as Group1 extras.  (SPA 56.)  Once revised, the Board directed NMDU to submit the lists to the Adjustment Board for approval and request that the Post also seek approval of the lists from the Adjustment Board.  (SPA 56.)  The Board directed NMDU to make whole any Post employees for any loss of earnings and other benefits, including adverse income tax consequences of receiving backpay in one lump sum, and to notify the Post and all unit employees employed by the Post on or after April 10, 2008, that it will no longer seek to enforce the discriminatory employment preferences.  (SPA 56-57.)

With respect to C&S and the Times, the Board directed NMDU to revise the bid list for the buyouts and transfers to the Times so that relative seniority for former C&S RSHs is determined by their make-steady date.  (SPA 57.)  Once

revised, if a C&S employee's buyout bid had been rejected based on his placement on the old list but that bid would have been accepted based on the revised list, the Board directed NMDU to request the Times to pay these employees $100,000; and, if the request is denied, NMDU shall make those adversely affected C&S employees whole.  (SPA 57.)  Similarly, if a C&S employee's transfer bid had been rejected based on placement on the old list but that bid would have been accepted based on the revised list, the Board ordered NMDU to make these employees whole for any losses suffered as a result of the discrimination.  (SPA 57.)  The Board also directed NMDU to request that the Times revise the seniority list of the former C&S employees it hired so that it reflects their unit seniority based on make-steady dates as C&S employees and to make employees whole for losses suffered, including compensation for any adverse tax consequences.  (SPA 57.)

With respect to the *General Motors* and *Beck* violations, the Board ordered NMDU to provide the required notices to all Post and Times bargaining unit employees.  (SPA 57.)  The Board also ordered NMDU to notify, in writing, Post employees and former C&S employees whom it initially sought to obligate to pay dues or fees under the union-security clause on or after May 24, 2008, for Post employees and on or after September 24, 2008, for former C&S employees, of their right to elect nonmember status and to file appropriate *Beck* objections.  (SPA

57.)  If an employee elects nonmember status, the Board directed NMDU to

process the objection as it otherwise would have done and to reimburse the

objecting nonmembers for the reduction in dues and fees.  (SPA 57.)

Lastly, the Board ordered NMDU to notify Altieri in writing that it will not

seek to prevent him from being employed by any employers because of his alleged

failure to pay dues and directed NMDU to post a remedial notice.  (SPA 57.)

## SUMMARY OF ARGUMENT

1.     Before the Court, NMDU fails to challenge the Board's finding that

NMDU unlawfully threatened to interfere with the employment of Daniel Altieri.

In its opening brief to the Court, NMDU does not contest that its actions violated

Section 8(b)(1)(A) of the Act.  This failure entitles the Board to summary

affirmance of that finding and summary enforcement of the portions of its Order

relating to that violation.

2.     Substantial evidence supports the Board's findings that NMDU's

actions violated Section 8(b)(1)(A) and (2) of the Act by engaging in conduct that,

in various ways, bestowed priority preferences to individuals who were union

members and who worked for union-signatory employers.  With respect to the

Post, substantial evidence amply supports the Board's findings that NMDU

maintained and enforced contract provisions and a side letter that conferred these

priorities; implemented these unlawful agreements, which resulted in non-union

24

members being denied both potential hirings and promotions to the Group 1 list; unlawfully denied promotions to individuals on the Post's Group 3 list; and took actions related to the C&S closure that gave priority preferences to union members over non-union members.[4]

With respect to the Times and C&S, the Board's findings are also supported by substantial evidence. There, too, NMDU violated Section 8(b)(1)(A) and (2) of the Act by engaging in conduct that conferred priority preferences to individuals based on union membership and work for union-signatory employers. Specifically, NMDU entered into a closure agreement, the benefits of which were granted in seniority order where seniority was based on union—rather than unit— seniority.

The Board's findings are also consistent with precedent under which the Board has long held that this type of priority-preference system runs afoul of the Act. NMDU offers no basis that would mandate a departure from this well-rooted position and concedes the basic factual predicate of the Board's findings. Instead, NMDU clouds the issue by highlighting the effect of its conduct on Group 2—one of the groups receiving priority preferences—rather than acknowledging the adverse effects of its conduct on other groups that are also represented by NMDU. NMDU also relies on inapposite cases and attempts to cast the Board's decision as

---

[4] "Non-union member" herein refers to a bargaining-unit employee working at the Post who is represented by NMDU and pays union fees but is not a union member.

inconsistent with precedent. None of its arguments provides a basis to disturb the Board's reasonable findings.

3. The Board reasonably rejected NMDU's affirmative defense that the unfair-labor-practice charges relating to the C&S buyouts and transfers was time-barred under Section 10(c) of the Act. Contrary to NMDU's misrepresentations, Board law makes clear that the six-month statute of limitations runs from the date of the complained-of action (here, the buyouts and transfers), and not from inauguration of the seniority list itself. Here, at least six charges were filed within six months of the November 20, 2008 closure agreement and side letter.

4. The Board reasonably found that NMDU failed to inform both Post and C&S unit employees of their rights under *General Motors* and *Beck*. NMDU produced a single 2003 bulletin posted at the Post facility and no C&S documents to establish its compliance with the necessary annual notice requirements. Further, no witnesses testified as to having sent or received notices. Under these circumstances, the Board reasonably found that NMDU had failed to inform employees of their *General Motors* and *Beck* rights. NMDU's claims to the contrary are predominantly based on a misapplication of Section 8(c), which the Board reasonably rejected.

## STANDARD OF REVIEW

The Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole.  29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 114 (2d Cir. 2001).  Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion."  *Universal Camera*, 340 U.S. at 477; *accord G & T*, 246 F.3d at 114.  The Board's reasonable inferences therefore may not be displaced on review even though the Court might justifiably have reached a different conclusion had the matter been before it *de novo*; as the Court has explained, "[w]here competing inferences exist, we defer to the conclusions of the Board."  *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 582 (2d Cir. 1988); s*ee also Universal Camera*, 340 U.S. at 488; *G & T*, 246 F.3d at 114.

This Court's review of the Board's legal conclusions is deferential: "This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law.  In so doing, we afford the Board 'a degree of legal leeway.'" *NLRB v. Caval Tool Div.,* 262 F.3d 184, 188 (2d Cir. 2001) (quoting *NLRB v. Town & Country Elec.*, 516 U.S. 85, 89-90 (1995)); *see also Office & Prof'l Emps. Int'l Union v. NLRB,* 981 F.2d 76, 81 (2d Cir. 1992) ("Congress charged the Board with the duty of interpreting the Act and delineating its scope.").  Therefore, the Court

will only reverse the Board's legal determinations if they are arbitrary and capricious. *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008).

## ARGUMENT

## I.    THE BOARD IS ENTITLED TO SUMMARY ENFORCEMENT OF THE UNCONTESTED PORTIONS OF ITS ORDER REGARDING NMDU'S THREATS TO DANIEL ALTIERI

NMDU does not contest before the Court the finding that it violated Section 8(b)(1)(A) of the Act by threatening to interfere with Daniel Altieri's employment based on his alleged dues arrearage. NMDU's waiver of this issue entitles the Board to summary affirmance of the finding and violation and summary enforcement of the uncontested portion of its Order. *See Torrington Extend-A-Care Emp. Ass'n v. NLRB*, 17 F.3d 580, 590 (2d Cir. 1994) (granting summary enforcement where party does not contest violations before the court). Further, the uncontested violation does not disappear simply because NMDU opted not to challenge it. Rather, it remains in the case and provides a backdrop against which the Court considers the other findings. *Id.*; *NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir. 1982).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS THAT NMDU VIOLATED THE ACT BY CAUSING AND ATTEMPTING TO CAUSE THE POST, THE TIMES, AND C&S TO DISCRIMINATE AGAINST CERTAIN EMPLOYEES BY GIVING PRIORITY PREFERENCES BASED ON UNION MEMBERSHIP AND PRIOR EMPLOYMENT WITH UNION-SIGNATORY EMPLOYERS

The key issue before the Court is whether the Board reasonably found that NMDU took actions that repeatedly favored union membership and membership with union-signatory employers. NMDU does not seriously contest the factual underpinnings of the Board's case, but, rather, attempts to confuse the matter by highlighting the effects on the individuals receiving the various unlawful priority preferences to argue that it did not discriminate. It also misrepresents the Board's findings. For example, contrary to NMDU's claim, the Board did not find that "unit seniority must be equated with union seniority," (Br. 15), but found that NMDU could not maintain and enforce a system that discriminated based on priority preference founded on NMDU membership and union-signatory employment at the expense of unit members who are not NMDU members. As demonstrated below, NMDU discriminated against employees who lawfully exercised their Section 7 right not to obtain employment with a union-signatory employer and sanctioned daily discrimination in hiring and benefits, the effects of which persist indefinitely.

A.     **Applicable Principles**

1.     **The Act prohibits a union from discriminating based on nonmember status**

Section 8(b)(1)(A) of the Act (29 U.S.C. § 158(b)(1)(A)) makes it an unfair labor practice for a labor organization to "restrain or coerce employees" in the exercise of their rights guaranteed by Section 7 of the Act (29 U.S.C. § 157). Section 7 guarantees employees the right to self-organization and to form, join, or assist labor organizations or to refrain from such activities.  Section 8(b)(2) of the Act (29 U.S.C. § 158(b)(2)) makes it an unfair labor practice for a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of" Section 8(a)(3) of the Act (29 U.S.C. § 158(a)(3)).[5]  In turn, Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." These provisions are intended to ensure that employees' jobs are insulated from their organizational rights.  *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954); *accord NLRB v. Bakery Workers Local 50,* 339 F.2d 324 (2d Cir. 1964).

The Board, with court approval, has long held that priority preferences based on union membership violate Section 8(b)(1)(A) and (2).  *See, e.g., Seafarers' Int'l*

---

[5] Section 8(a)(3) allows an exception to this general principle.  A lawful union-security clause may require payment of uniformly required union dues and fees as a condition of employment.  29 U.S.C. § 158(a)(3).

*Union,* 244 NLRB 641, 642 (1979) (hiring hall procedures that accorded

preference to jobseekers who were union members over nonmembers was

unlawful); *Painter's Local Union No. 77*, 222 NLRB 607, 610 (1976)

(conditioning employment "on considerations of prior union representation"

violates Section 8(b)(1)(A) and (2) of the Act); *IATSE, Local 659*, 197 NLRB

1187, 1189-90 (1972) (conditioning employment with a union-signatory employer

on prior or current union membership violates Section 8(b)(1)(A)), *enforced*, 477

F.2d 450 (D.C. Cir. 1973) (unpublished opinion).

The Board reasons that priority preferences based on union membership

"penalize employees for having exercised their statutory right to refrain from

bargaining collectively through [the union] in the past, while rewarding those

employees who have chosen to work in units represented by [the union]." *IATSE*,

197 NLRB at 1190; *see also Directors Guild of Am., Inc.*, 198 NLRB 707, 709

(1972), *enforced*, 494 F.2d 692 (9th Cir. 1974) (citing with approval the Board's

decision in *IATSE*). According to the Board, priority preferences constitute "an

invasion of the undoubted right of employees under Section 7 of the Act to refrain

from union activities." *Id*. Further, because encouragement of union membership

is a natural and foreseeable consequence of such discriminatory preference, a

union must be presumed to have intended such encouragement. *See Radio

Officers' Union*, 347 U.S. at 52.

### 2. The Act prohibits a union from discriminating within a single unit based on union seniority

Likewise, a union violates the Act by according a priority preference among a single unit based on union—as opposed to unit—seniority. *See, e.g.*, *Interstate Bakeries Corp.*, 357 NLRB No. 4, 2011 WL 2596443, at *4 (June 30, 2011), *enforced*, 488 Fed. App'x 280 (10th Cir. 2012) (unlawful to put employees at the end of seniority list because they were unrepresented in their prior employment); *Teamsters Local 435,* 317 NLRB 617, 617 n.3 (1995) (unlawful to give less seniority to an employee group on the basis that those employees had not been represented by a union as long as employees in another group), *enforced*, 92 F.3d 1063 (10th Cir. 1996); *Teamsters Local 480,* 167 NLRB 920, 920 n.1 (1967) (unlawful to place an employee on the bottom of the seniority list "because employees of [his employer] had not been represented by a labor organization"), *enforced*, 409 F.2d 610 (6th Cir. 1969).   A priority-preference system that distinguishes between union seniority (based on employment with a union-signatory employer) and unit seniority is no different than a preference based on union membership: the union penalizes employees for having lawfully exercised their right to refrain from engaging in union activities in the past and rewards (through greater seniority) those employees who have chosen to work for union-signatory employers.  Further, as the Board has observed, because a union likely makes other employees aware of its discriminatory conduct, that conduct

"create[s] an impact on other employees, the natural consequence of which was to restrain and coerce them in the exercise of their Section 7 rights, in violation of Section 8(b)(1)(A) of the Act." *Stage Emps. Local 659,* 197 NLRB 1187, 1191 (1972), *enforced mem.* 479 F.2d 450 (D.C. Cir. 1973).[6]

## B. The Board Reasonably Determined that NMDU Violated the Act with Respect to Post Employees

Here, the Board applied the basic rule of law established by the principles outlined above: "discrimination in hiring and promotion based solely on union considerations (i.e., union membership and/or prior employment with union-signatory employers) is unlawful."[7]  (D&O 4.)  With respect to the Post, the discriminatory violations are well established, and the Board's multiple unfair-labor-practice findings are amply supported by record evidence.

### 1. Substantial evidence supports the Board's finding that NMDU maintained and enforced agreements that gave unlawful priority preferences to nonunit employees based on union considerations

There is no factual dispute that the 2003 NMDU-Post agreement and the October 29, 2003 side letter granted priority preferences to individuals in Groups 1 and 2, which include only union members and individuals who worked or are

---

[6] As we show below, the Board relied on these well-established principles, and therefore NMDU's assertions (Br. 15) that the Board has failed to articulate a rationale for its decision and departed from precedent are non-starters.

[7] Herein, we adopt the Board's definition of "union considerations" as referring to union membership and prior employment with a union-signatory employer.

working for other union-signatory employers.  Under the 2003 NMDU-Post

agreement, individuals in Groups 1 and 2 have priority for hiring over individuals

in Groups 3 and Group 4, who are Post bargaining-unit employees ineligible for

union membership.  Further, under Section 4-A.4(j), RSHs (union members)

employed for at least five consecutive years at a union-signatory employer are

permitted to transfer to the Post's Group 1 list and thus have higher priority for

hiring than Groups 3 and Group 4, which are comprised uniquely of non-union

members.   Further, under the October 2003 side letter, the Post is required to add

RSHs and Group 1 extras (union members) from other union-signatory employers

to the Post's Group 1 list.

Based on these unambiguous contract provisions, the Board properly found

(SPA 48 n.9) that NMDU unlawfully maintained and enforced certain contract

provisions that grant a priority preference to union members to the detriment of

non-union members.  The preferences are extended exclusively to RSHs and

individuals in Group 1, which constitute the only union classifications eligible for

union membership.  While these provisions refer to seniority "in the industry," the

provisions are expressed in terms that only have meaning in reference to

agreements with NMDU, thereby making it clear that employment with union-

signatory employers is required.  Employees of other union-signatory employers

receive priority preference for work, which allows for superior wages and benefits.

Accordingly, NMDU, by maintaining and enforcing these agreements, has

conferred an unlawful priority preference based on union considerations.  *See, e.g.,*

*Seafarers' Int'l Union,* 244 NLRB at 642.

> **2. Substantial evidence supports the Board's finding that NMDU granted unlawful priority hiring preference to individuals on the Group 2 list**

The Board found (SPA 48) that "the daily award of hiring preferences to

Group 2 employees (RSHs and Group 1 [individuals] of other [union-]signatory

employers" violated the Act.  It is undisputed that NMDU maintains the Group 2

list and places individuals on the list in order of union membership date.  Group 2

employees will be hired before any non-union member listed in Group 3 or 4.  The

Post has not been party to a multiemployer bargaining unit since 1975, so NMDU

cannot find a safe harbor in a multiemployer unit.[8]  This process "confers a

preference based on an individual's length of employment with [union-signatory

employers] other than the Post."  (SPA 34.)  As such, the Group 2 priority

preference unlawfully penalizes individuals for not having worked for union

employers.  *See, e.g., IATSE*, 197 NLRB at 1190.

---

[8] In *Newspaper & Mail Deliverers' Union*, 227 NLRB 608 (2002), an administrative law judge found that the Post was *not* part of a multiemployer bargaining unit; the Board affirmed that factual finding.

### 3. Substantial evidence supports the Board's finding that NMDU unlawfully prevented the promotion of unit employees

As detailed in the facts section above (pp. 15-18), NMDU refused to convene the Adjustment Board to fill vacancies on the Post's Group 1 list. At one point, the entire Group 1 list was vacant, and still NMDU refused to meet. The 2003 NMDU-Post agreement vests the Adjustment Board with exclusive authority to fill Group 1 vacancies, so NMDU's refusal to meet froze the Group 1 list and precluded the Post from elevating Group 3 individuals (non-union members) to Group 1. Ultimately, NMDU's refusal caused these employees to lose potential job assignments to Group 2 individuals—union members working for other union-signatory employers.

The Board concluded that NMDU acted deliberately because it "wanted to keep the Post's Group 1 list … unfilled because it … was aware that [C&S] was going out of business and … was going to make an effort to have the C&S employees placed elsewhere." (SPA 14.) The reason for freezing the list, however, is of no moment. The question is "in dealing with this difficult circumstance, whether it acted and made agreements with the respective employers within the limits allowed by the [Act]." (SPA 24.) The Board properly found that NMDU acted outside the Act's limits by causing the Post to discriminate against

non-union members (individuals on the Group 3 list) by denying their

advancement to a higher seniority group.  In doing so, it ran afoul of the Act.

> **4.  Substantial evidence supports the Board's finding that NMDU unlawfully conferred a priority hiring preference to former C&S RSHs**

The Board found that NMDU continued to discriminate against non-union

members by applying certain contractual provisions and Adjustment Board orders

concerning the closure of C&S.  Specifically, under the side letter and through the

orders, NMDU agreed to transfer dozens of former C&S employees to the Post's

Group 1 list therefore unlawfully discriminating against the Post's own non-union

member employees.  As the Board explained, "when they sought employment at

the Post, RSHs and/or Group 1 extras were awarded a hiring preference based on

their union membership and/or their RSH or Group 1 status at other union-

signatory employers and in different bargaining units."  (SPA 48.)  By virtue of

this preference, "they had priority in hiring over the Post's own Group 3 and 4

extras who had greater unit seniority, but were disfavored because they were

unrepresented and/or had less overall [union] seniority."  (SPA 48.)  That is to say,

the former C&S employees were placed on the Group 1 list and continued to hold

more senior positions on that list.  Indeed, when individuals on the Post's Group 3

list were finally moved to the Group 1 list, they were placed in lower order than

former C&S employees.  NMDU's seniority system was "based on the amount of

time that an employee worked for union-signatory shops and not one that measured seniority by the amount of time that the employee worked with either C&S or the [] Post." (SPA 24.) Accordingly, substantial evidence supports the Board's finding that NMDU violated the Act by applying contract provisions and Adjustment Board orders that penalized employees for exercising their Section 7 rights not to work for a union-signatory employer. *IATSE*, 197 NLRB at 1190; *Directors Guild*, 198 NLRB at 709.

In sum, each of the Board's findings that NMDU committed violations of the Act are predicated on the same rationale: "[NMDU's] maintenance and application of its industry-wide priority number system, operating in tandem with union-security requirements, unlawfully favored individuals who were union members and/or had greater length of employment with union-signatory employers as RSHs or Group 1 extras; and this arrangement disfavored individuals who were not union members and/or had not worked for union signatory employers." (SPA 48.)

## C. The Board Reasonably Determined that NMDU Violated the Act with Respect to Certain C&S and Former C&S Unit Employees

The Board's analysis in the C&S and Times cases is "essentially the same" as in the Post cases: NMDU used industry-wide seniority to confer priority preferences to certain C&S and former C&S unit employees when handling the C&S closure. (SPA 48.) Specifically, the Board found that NMDU violated the

Act by using industry-wide seniority among employees in the C&S unit to offer

them buyouts and transfers. The Board's findings are amply supported by

substantial evidence.

In anticipation of the C&S closure, NMDU compiled and published lists

ranking C&S bargaining-unit employees according to industry-wide priority. As

detailed above, industry-wide priority was defined specifically as work with union-

signatory employers. Indeed, the closure agreement and closure side letter made

clear that seniority "would *not* be based on [an RSH's] seniority date with C&S but

rather would be based on how long that individual had worked for companies

having contracts with the union." (SPA 19.) As discussed more fully above (29-

32), the Board has long held that this type of system discriminates against those

employees who have chosen to exercise their Section 7 right not to work for union-

represented employers.

NMDU required the Times to offer buyouts and transfers under the closure

agreement in order of industry-wide seniority. "There is no question but that the

use of industry-wide priority numbers [i.e., union-based seniority] to select buyouts

or the transfers gave some C&S employees with less C&S seniority some degree of

preference in terms of having their choices selected." (SPA 20.) Further, for those

C&S bargaining-unit employees who transferred to the Times as an RSH, the use

of industry-wide seniority rather than C&S seniority affected their relative

placement on the Times' seniority list. "[T]he use of seniority based on time worked for all signatory employers gives a distinct advantage versus those whose seniority is measured only by their employment with C&S." (SPA 20.) As such, because seniority status among RSHs determines various terms and conditions of employment, individuals with greater industry-wide seniority enjoyed better terms and conditions of employment ahead of individuals with greater C&S seniority. *See, e.g., Teamsters Local 480,* 167 NLRB at 920 n.1; *Woodlawn Farm Dairy Co.*, 162 NLRB 48, 50 (1966). Accordingly, NMDU's actions also violated the rights of former C&S employees who were endtailed to the Times' seniority list.

**D.    The Board's Decision Is Consistent with Board Precedent**

**1.    The Board properly distinguished *Teamsters Local Union 896***

Contrary to NMDU's assertion (Br. 18-20), and as explained by the Board, the Board's decision is consistent with *Teamsters Local Union 896*, wherein the Board dismissed a Section 8(b)(1)(A) and (2) complaint based upon a contract provision that permitted laid-off permanent employees of union-signatory employers to bump temporary or new unit employees with low seniority. 296 NLRB 1025, 1028 (1989). In that case, the Board reaffirmed the general principle that seniority systems that discriminate on the basis of union membership are unlawful. *Id.* The Board determined, however, that there was "no evidence" of discrimination based on nonunion membership or nonunit status. *Id.* In finding

the provision susceptible to a lawful interpretation, the Board further cautioned that the result "might well be different if there were evidence that nonunion or nonunit permanent employees actually had been denied the seniority preference." *Id.* at 1028 n.5. The Board emphasized that the bumping rights did not "create a general referral class preference based exclusively on work experience under union signatory and union security conditions." *Id.* at 1028. The circumstances presented by the instant case fall within these caveats.

Here, the uncontested facts undeniably establish that NMDU's priority-preference system favored nonunit union members in several ways and adversely affected non-union members (individuals on the Post's Group 3 and 4 lists). NMDU wrongly focuses (Br. 19) on Group 2 in an attempt to show that there was no unlawful discrimination.[9] The adverse effect, however, is felt by those in Groups 3 and 4, who are ineligible for union membership. For example, NMDU enforced contractual provisions that granted priority hiring preference to individuals on the Group 2 list, who are union members working for other union-

---

[9] With respect to the Times/C&S situation, NMDU similarly focuses on the wrong group by stating (Br. 19) that no unrepresented employees ever sought a buyout at the Times. The Board found (SPA 48) that NMDU had violated the Act by according C&S unit employees—who are represented by NMDU—higher seniority based on union considerations rather than C&S seniority. As explained more fully above (at pp. 29-32), this type of priority preference impinges on an employee's Section 7 rights to refrain from union membership and discriminates against employees who chose not to work for union-signatory employers.

signatory employers, above the non-union members in Groups 3 and 4. NMDU

also refused to elevate individuals on the Group 3 list to Group 1. NMDU, instead,

transferred RSHs from C&S and individuals on C&S's Group 1 list—both groups

are union members—to the Post's Group 1 list ahead of Groups 3 and 4—both of

which include only non-union members. Given these undisputed facts, NMDU's

various proclamations that there is "no evidence" (Br. 18, 19, 21) of discrimination

are patently false.[10] As the Board properly determined, this case stands in stark

contrast to *Teamsters Local Union 896* and squarely presents the distinct factual

scenario the Board stated could warrant a different result.[11]

### 2. The Board's Decision Is Consistent with *Interstate Bakeries Corp.*

NMDU asserts (Br. 20) that the Board's decision here somehow conflicts

with *Interstate Bakeries Corp.*, 357 NLRB No. 4, 2011 WL 2596443 (June 30,

2011), *enforced sub nom. NLRB* v. *Teamsters Local Union No. 523*, 488 Fed.

---

[10] NMDU misses the mark by asserting that "nothing in the arrangement [] would *encourage* a Group 3 employee to become a union member." (Br. 19; emphasis in original.) Priority hiring preferences are conferred on union members—to the detriment of the non-union members in Groups 3 and 4—and the foreseeable consequences of NMDU's actions are presumed. *See Radio Officers' Union*, 347 U.S. at 52.

[11] The Board further distinguished (SPA 31) *Teamsters Local Union 896* because the employers in that case were all members of an overall single multiemployer bargaining unit who agreed to continue skill-based preferences. In the instant case there is no evidence that preferences were based on skill, and the relevant employers (the Times, the Post, and C&S) were *never* all members of any single, overall multiemployer bargaining unit.

App'x 280 (10th Cir. 2012). As the Board properly observed, however, this case "affirm[s] the legal propositions of the General Counsel." (SPA 77.)

In *Interstate Bakeries*, the employer consolidated two units and agreed with the union to dovetail the two unit seniority lists into one merged list. The new merged unit, however, included one previously unrepresented employee. The union decided to place that employee at the end of the seniority list because he had been previously unrepresented, despite the fact that he had worked for the employer (though not as a unit employee) the longest. The Board determined that the union violated the Act by placing him at the end of the seniority list because he had been unrepresented. *Interstate Bakeries*, 2011 WL 2596443, at *4-5. According to the Board, "[t]he only difference between [the discriminatee] and those employees in regard to unit seniority was that he had *not* been previously represented by the Union." *Id.* at *5 (emphasis in original). That is to say, all employees in that case belonged to the same unit, and the union had an obligation to represent all of them without discriminating against any on the basis of prior union membership.

The Board clearly articulated in *Interstate Bakeries* that the Act requires the use of union-neutral criteria in determining terms and conditions of employment, including seniority. As discussed above (pp. 29-32), the tying of seniority to union considerations plainly encourages union membership. *See Radio Officers' Union*,

347 U.S. at 26-27, 42.  With respect to the Times/C&S cases, all C&S employees belonged to the same unit, and NMDU drew a distinction for buyouts and transfers based on length of NMDU membership.  This it could not lawfully do.  Accordingly, *Interstate Bakeries*—rather than being inconsistent with the current decision—compels the conclusion that NMDU violated the Act.

### E. The Board's Decision Is Distinguishable from *NLRB v. New York Typographical Union No. 6* and *NLRB v. Whiting Milk Corp.*

Contrary to NMDU's contention (Br. 17-18), the Court's decision in *NLRB v. New York Typographical Union No. 6*, 632 F.2d 171 (2d Cir. 1980), does not mandate a different result.  As the Board properly found, the factual backdrop of that case is "materially different."  (SPA 49.)  In *New York Typographical*, the Board determined that a union violated the Act by establishing hiring hall procedures that favored union members over nonmembers.  The Court reversed the Board's finding on the basis that there was "insufficient evidence to support a finding that the preference … discriminates against non-[u]nion members," or that the procedures had the effect of encouraging union membership.  *Id.* at 181.  In doing so, the Court highlighted that the favored class included nonmembers, and that individuals in the favored class had to already be working for union-signatory employers, so the class was closed to new members; therefore, "[o]ne cannot gain [the] benefit by joining the Union."  *Id.* at 182.  The Court emphasized that the conferred benefit did not encourage membership because it was not likely to be

repeated in future contracts due to automation in the industry. *Id.* Rather, "[t]he need for such special protections [to minimize the potential adverse impact of automation] will diminish." *Id.* Lastly, the Court noted the "crucial and direct" purpose of the preferences was to protect the integrity of a trust fund maintained by employer contributions that guaranteed income to certain employees. *Id.*

Unlike the evidence concerning discrimination in *New York Typographical*, there is no dearth of evidence here. The record contains concrete examples of unlawful union considerations to the detriment of non-union members. For example, non-union members on the Post's Group 3 and 4 lists were repeatedly denied hiring opportunities in favor of union members at other union-signatory employers. Further, there is no evidence that Groups 1 and 2, the groups receiving the priority preferences, included any similarly situated nonmembers; nor is the priority-preference class closed. For example, any RSH or Group 1 individual employed by any union-signatory employer will continue to be hired—if they shape at the Post—ahead of anyone in the Post's Group 3 or 4 list. As such, unlike in *New York Typographical*, individuals *can* gain a benefit by joining NMDU. Finally, here, there is no concern regarding the "continued financial viability of [a] fund established to ease the path for employees to exit the industry." (SPA 76.) Accordingly, the Board properly distinguished *New York Typographical*.

So too, NMDU's reliance (Br. 21-22) on *NLRB v. Whiting Milk Corp.*, 342

F.2d 8 (1st Cir. 1965), is misplaced. In *Whiting*, an employer acquired a

competitor that had five facilities, four of which were covered by the same

multiemployer contract that covered the acquiring employer. *Id.* at 10. By the

terms of that multiemployer contract, the seniority of the employees of the four

covered facilities was "dovetailed" with the seniority of the acquiring employer's

employees. *Id.* However, the fifth plant had been nonunion, and those employees

were given seniority only from the date of acquisition. They were subsequently

laid off because of this "endtailing." *Id.* A divided court reversed the Board's

finding of a violation. In its decision, the First Circuit expressly noted that "[t]his

is not a case in which the Union bargained for preferential benefits for members of

the Union in the unit it represented relegating non-union employees in the unit to

an inferior status." [12] *Id.* at 11. The instant case presents that scenario. NMDU

bargained for preferential benefits for Post employees who were union members

and previously employed by union-signatory employers (Groups 1 & 2) at the

expense of non-union, but represented, employees (Groups 3 & 4). Similarly, at

C&S, notwithstanding that all employees were represented, NMDU bargained a

---

[12] In *Whiting*, as the Board's opinion makes clear, after the acquisition of one
employer by another, the formerly unrepresented employees of the acquired
company were treated as an accretion to the existing unit of employees of the
acquiring company. *See Whiting Milk Corp.,* 145 NLRB 1035, 1036 (1964). The
First Circuit was therefore wrong in viewing them as nonunit employees.

46

closing agreement that gave preferential treatment based on similar union considerations to certain C&S employees while relegating those C&S employees who had not previously worked for a union-signatory employer to an inferior status.  NMDU's claim (Br. 22, emphasis added) that "there is no evidence that any *non-represented* employees ever applied for, or were denied, the employment benefits granted by the Times and [the Post]" is beside the point.  All affected employees are represented by NMDU.

Even if these two cases were not distinguishable, which they are, the Board would not be required to follow theirs holdings, as NMDU contends.  The Board, from its earliest days, has administered the Act consistently with its authority to decide federal labor law on a national basis.  When subject to adverse circuit court decisions, the Board maintains its position as it seeks, sometimes for protracted periods, to bring about an appropriate Supreme Court test of its legal positions. *See, e.g., Ford Motor Co. v. NLRB*, 441 U.S. 488, 493 n.6 (1979) (the Supreme Court noted, in affirming a decision of the Seventh Circuit, that the Board had adhered to its legal position over a ten-year period despite adverse decisions in the First, Fourth, and Seventh Circuits).

The Act "is federal legislation, administered by a national agency, intended to solve a national problem on a national scale."  *NLRB v. Natural Gas Util. Dist.*, 402 U.S. 600, 603-04 (1971).  While a court may disagree with the Board's

47

statutory interpretation, an agency of the United States such as the Board, like

other parties, "is entitled to adhere to what it believes to be the correct

interpretation of a statute and to reap the benefits of this adherence if it proves to

be correct, except where bound to the contrary by a final judgment." *United States

v. Donnelly*, 397 U.S. 286, 294 (1970). And, unlike private parties, an agency of

the United States is not precluded from relitigating issues decided adversely to it in

prior cases brought by different parties. *See United States v. Mendoza*, 464 U.S.

154, 158-63 (l984). If an agency has a reasonable basis for believing that a court

erred in a prior decision, it is no affront to ask that court to distinguish, modify, or

overrule its prior precedent.

The Board's policy not to acquiesce automatically to an adverse circuit court

decision is also a practical necessity in view of the Act's broad venue provision,

which permits an aggrieved party to seek review "in the circuit wherein the unfair

labor practice in question was alleged to have been engaged in or wherein such

person resides or transacts business, or in the United States Court of Appeals for

the District of Columbia." 29 U.S.C. § 160(f). Implicit in that provision is a

congressional judgment that the Board should not be guided by the views of any

single circuit when it makes its decisions. *Arvin Auto.*, 285 NLRB 753, 757-58

(1987). Indeed, venue uncertainty prevents the Board from predicting which

circuit will review a given decision. More fundamentally, the Board is therefore

always on notice that, even if it adopts the views of one circuit, it does not enjoy a

safe harbor because it must be prepared to defend that new position nationwide.

Accordingly, contrary to NMDU's assertion, even if *New York Typographical* and

*Whiting* were not materially distinguishable from this case, the Board would not

have been required to follow their holdings.

### F.    NMDU's Remaining Arguments Are Meritless

NMDU posits (Br. 20) that it merely made "adjustments" within its

discretion with respect to C&S employees.  This claim is plainly at odds with

Board law that prohibits the precise type of "adjustments" NMDU made based on

unlawful union considerations.  (See pp. 29-32.)  Further, NMDU does not

advance its claim (Br. 20-21) by citing inapposite cases, none of which was

decided under the Act.[13]  At least one of the cited cases, *Jones v. Trans World

Airlines*, 495 F.2d 790 (2d Cir. 1974), lends analogous support to the Board's

decision here.  In *Jones*, this Court, in determining that a union violated its duty of

fair representation under the Railway Labor Act by basing seniority on union

membership, stated: "[d]iscrimination in seniority based on nothing else but union

---

[13] Both *Ford Motor Co. v. Huffman*, 345 U.S. 330 (1953), and *Aeronautical Industrial District Lodge 727 v. Campbell*, 337 U.S. 521 (1949), involved seniority lists affected by military service considerations.  In *Humphrey v. Moore*, 375 U.S. 335, 349-50 (1964), the Supreme Court recognized that a union could take a position that benefits some members at the expense of others so long as it acts reasonably and without discrimination.  Here, the Board determined that NMDU's actions were discriminatory, and nothing in *Humphrey* undermines that determination.

membership is arbitrary and invidious and violates the union's duty to represent fairly all members of the bargaining unit." *Id.* at 797.

Likewise, NMDU's reliance (Br. 21) on *Riser Foods, Inc.*, 309 NLRB 635 (1992), is unavailing. That case involved a union's lawful refusal to dovetail certain employees' seniority at a time when it did not owe a statutory duty of fair representation to those employees. *Id.* at 636. NMDU does not explain how *Riser Foods* privileged its decision to draw distinctions in seniority based purely on union considerations among employees in a single unit, to whom NMDU indisputably owed a duty of fair representation.

NMDU's claim that it can avoid liability because it did not act with "a motive proscribed by the Act" (Br. 23) is contrary to Supreme Court precedent. In *Radio Officers' Union*, the Court stated that evidence of intent to encourage or discourage membership "is not an indispensable element" to prove that a union has caused an employer to discriminate. 347 U.S. at 44-45. "[S]uch proof is not required where encouragement or discouragement can be reasonably inferred from the nature of the discrimination." *Id.* at 51; *see also Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 778 F.2d 8, 10 (D.C. Cir. 1985) ("Whether particular employer conduct caused by the union actually encourages union membership need not be proved by direct evidence."); *Int'l Photographers of Motion Picture Inds. v. NLRB*, 477 F.2d 450, 1973 WL 21501, *1 (D.C. Cir. Apr. 27, 1973) ("A

finding of a section 8(b)(1)(A) violation does not require actual proof of intent to influence the exercise of section 7 rights. The Board's inferences concerning the 'natural foreseeable consequences of the conduct' were adequately supported by the record. *See Lummus Co. v. NLRB,* 339 F.2d 728, 734 (D.C. Cir. 1964)[; *s*]*ee also Teamsters Local 357 v. NLRB,* 365 U.S. 667, 675 (1961); *Radio Officers' Union*[, 347 U.S. at 51].") (unpublished opinion).

Accordingly, under Supreme Court precedent, the Board rightly may infer an unlawful motive where a priority-preference system is based on unlawful union considerations. *See, e.g.*, *IATSE*, 197 NLRB at 1189 ("[T]he existence of a collective-bargaining agreement connotes representation by a union, the deprivation of employment with employers who are parties to collective-bargaining contracts with [the union] flows from the failure of an employee to have been previously represented by [the union].") ; *Directors Guild*, 198 NLRB at 709 (denial of employment preferences based on lack of union membership violates the Act).

NMDU offers (Br. 24-27) three unavailing "business justifications" to excuse its liability.[14] First, the consent decree approved by the Court in *Patterson*

---

[14] *NLRB v. Milk Drivers & Dairy Employees*, 531 F.2d 1162 (2d Cir. 1976), does not help NMDU establish a "justification" for its actions. In that case, this Court upheld the Board's finding, as a reasonable inference, that granting super-seniority to the shop steward unlawfully encouraged membership. *Id.* at 1166. There, the Court stated that, in the absence of evidence as to any motive based on inference or

*v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767 (2d Cir. 1975), *affirming*

384 F. Supp. 585 (S.D.N.Y. 1974), is not relevant to the present case.  As the

Board noted, "the Board was not a party to the settlement, and racial and ethnic

discrimination alleged there is different from the type of discrimination alleged

here."  (SPA 45 n.3.)  The agreement, while "admirable," has "nothing to do with

the claims herein that NMDU has discriminated in favor of union members and

against individuals on the basis of their lack of union membership."  (SPA 11.)

Second, contrary to NMDU's claim (Br. 25), the relevant employers in this case

were *not* all members of a single multiemployer association.  Affected employees

worked for employers who once belonged to the Publishers' Association, the

Wholesalers' Association, or no association at all.  Third, NMDU cites no

authority (Br. 26) for the proposition that the Act permits a union to trample

employees' Section 7 rights so long as the union sought to preserve the work of

select members of its bargaining unit during a time of decline and potential

unemployment.  Irrespective of whether NMDU was "trying to do its best in a bad

situation" (SPA 24), the Act clearly makes NMDU's actions unlawful.

---

otherwise, the union could avoid liability by demonstrating a justification for a
super-seniority clause that granted the shop steward top seniority.  *Id*.  Here,
NMDU's actions were presumptively unlawful because it created a system that
granted preferences based on unlawful union considerations, and its motive is
inferred as a foreseeable consequence of the actions themselves.

### III. THE BOARD REASONABLY REJECTED NMDU'S AFFIRMATIVE DEFENSE THAT THE UNFAIR-LABOR-PRACTICE CHARGES CONCERNING THE C&S BUYOUTS WERE TIME-BARRED UNDER SECTION 10(b) OF THE ACT

Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to filing of the charge with the Board." (29 U.S.C. § 160(b)) Because "the six-month limitations period functions as an affirmative defense to an unfair practice charge, the party … relying on the defense has the burden of proof to establish the untimeliness of the charge." *NLRB v. Pub. Serv. Elec. & Gas Co.*, 157 F.3d 222, 228 (3d Cir. 1998); *accord NLRB v. Glover Bottled Glass Corp.*, 905 F.2d 681, 685 (2d Cir. 1990). Here, NMDU claims (Br. 28-30) that the charges concerning the seniority system for C&S buyouts are time-barred because the unlawful seniority system has been in effect for "almost 60 years."[15] Even taking NMDU's claim of a decades-old system at face value, its argument fails.[16]

In rejecting NMDU's claim, the Board properly relied on (SPA 26-27) *Whiting Milk Corp.*, 145 NLRB 1035 (1964), *enforcement denied on other grounds*, 342 F.2d 8 (1st Cir. 1965), wherein the Board rejected a similar Section

---

[15] In its brief, NMDU confines its Section 10(b) argument to the charges relating to the C&S buyouts. (Br. 28-30.)

[16] The record does not establish that NMDU and C&S ever established a system that accorded transfer benefits based on experience with a union-signatory employers.

10(b) argument that the statute of limitations should run from the date that the seniority status was first established and not from the date that two employees were laid off pursuant to the seniority list. As the Board explained in *Whiting*, "[t]he seniority roster on which [two employees] were placed prior to the 10(b) period was dependent upon, and had no durability or binding force of its own apart from the contractual provision which required it." *Id.* at 1037-38; *accord Teamsters Local Union 896*, 296 NLRB 1025, 1027-28 (1989) (rejecting 10(b) claim where complaint challenged the unlawful enforcement of a contract's bumping rights provision in the six-month period prior to the filing of the charge and not the execution of the contract); *Auto Workers Local 1131*, 271 NLRB 1411, 1416 (1984) (same), *enforced*, 777 F.2d 1131 (6th Cir. 1985). The Board's position in *Whiting* was consistent with Board precedent. *See Potlatch Forests, Inc.*, 87 NLRB 1193 (1949), *enforcement denied on other grounds*, 189 F.2d 82 (9th Cir. 1951). In *Potlatch Forests*, the Board identified the issue as "not whether the [union] committed an unfair labor practice by inaugurating the policy, but whether it violated the law by continuing to maintain it; more specifically by applying and giving effect to it in the lay-offs." 87 NLRB at 1211. The Supreme Court has tacitly sanctioned this approach. *See Local Lodge No. 1424 v.* NLRB, 362 U.S. 411, 419-20 (1960).

Consistent with that body of law, the Board found that NMDU violated the

Act by enforcing a November 20, 2008 closure agreement and side letter that gave

priority employment preference to individuals formerly employed by C&S and

priority hiring preference to former C&S employees based on union membership

and employment with union-signatory employers.  (SPA 50.)  To be clear, the

Board did not find, nor does the complaint allege, that the inauguration of the

seniority list itself was unlawful.  Here, at least six charges relating to C&S's

closure were filed within six months of November 20, 2008, when NMDU

executed the agreement defining seniority as industry-wide seniority.  (A. 534,

536, 538, 542, 548, 554.)  Accordingly, NMDU's attempt to invoke 10(b) must

fail.

NMDU's reliance (Br. 28) on *Bowen Products Corp.*, 113 NLRB 731

(1955), is misplaced.  In that case, a former unit employee, once returned to the

unit after having served in a supervisory position, was not credited with any pre-

supervisory experience.  When he was returned to the unit, he was aware of—and

even disputed with both the union and his employer—his adjusted seniority date.

(*Id*. at 738.)  According to the Board, at that time, "he knowingly [] sustained an

immediate injury under the Act which could have been remedied had he filed

charges within the statutory 6-month period of limitation."  *Id.* at 732.  When his

employer later laid him off based on low seniority, more than six months had

elapsed between his return to the unit and his lay off.  Consequently, his claim was

time-barred by Section 10(b).  That situation is decidedly distinct from the instant

case, where charges were clearly filed within six months of NMDU's

implementation of the discriminatory seniority provisions contained in the closure

agreement and side letter.

## IV. THE BOARD REASONABLY DETERMINED THAT NMDU FAILED TO GIVE UNIT EMPLOYEES AT THE POST AND C&S SUFFICIENT NOTICE OF THEIR RIGHTS UNDER THE SUPREME COURT DECISIONS OF *GENERAL MOTORS* AND *BECK*

### A. Union-Security Agreements

As noted above (pp. 29-30), Section 7 of the Act affords employees the right

to engage in a broad range of concerted activities, including joining labor

organizations, for the purpose of collective bargaining or other mutual aid or

protection.  That section also grants employees "the right to refrain from any and

all such activities except to the extent that such right may be affected by an

agreement requiring membership in a labor organization as a condition of

employment as authorized in [S]ection 8(a)(3) . . . ."  29 U.S.C. § 157.  Section

8(a)(3) of the Act specifies that collective-bargaining agreements may contain

union-security provisions requiring that employees become members of the union

as a condition of employment.  While employee jobs should be insulated from

organizational rights, Congress also recognized that absent any union-security

agreements, many employees would receive the benefits of union representation

but refuse to contribute financial support to the union through payment of dues.
*Radio Officers' Union*, 347 U.S. at 40; *see also* S. Rep. No. 105, 80th Cong., 1st
Sess. at 6 (1947).

The Supreme Court has interpreted a membership requirement contained in
a union-security clause as obligating employees only to pay union fees or dues.
Thus, despite the broad meaning that might be implied by the term "membership"
in the first proviso of Section 8(a)(3), "'[m]embership' as a condition of
employment is whittled down to its financial core." *NLRB v. Gen. Motors Corp.*,
373 U.S. 734, 742 (1963); *accord Commc'n Workers v. Beck*, 487 U.S. 735, 745
(1988). In short, so long as the employee pays the dues and fees that lawfully may
be required, he is "protected from discharge" even if he refuses to join the union.
*Local Union No. 749, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths,
Forgers & Helpers v. NLRB*, 466 F.2d 343, 344 n.1 (D.C. Cir. 1972). In *Beck*, the
Supreme Court refined the "financial core" obligations of employees working
under union-security agreements and carved out "the obligation to support union
activities beyond those germane to collective bargaining, contract administration,
and grievance adjustment." *Beck*, 487 U.S. at 745. Thus, those employees who
oppose supporting activities not germane to collective bargaining are entitled to
have their payments to the union reduced by the percentage of the union's total
expenditures spent on nonrepresentational activities, thereby paying "an 'agency

fee' representing the portion of the dues that the union expends in its collective

bargaining activities." *Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*,

133 F.3d 1012, 1015 (7th Cir. 1998).

### B.      Duty of Fair Representation

As discussed above, Section 8(b)(1)(A) of the Act makes it an unfair labor

practice for a union to "restrain or coerce . . . employees in the exercise of the

rights guaranteed in [Section 7 of the Act]."  That section imposes a duty of fair

representation on a union in its role as the exclusive representative of employees

for collective-bargaining purposes. *California Saw & Knife Works*, 320 NLRB

224, 225-26 (1995), *enforced sub. nom. Int'l Ass'n of Machinists & Aerospace

Workers v. NLRB*, 133 F.3d 1012 (7th Cir. 1998) ("*California Saw*").  The

judicially-created duty of fair representation reflects the principle that a union's

status as the exclusive representative "includes a statutory obligation to serve the

interests of all members without hostility or discrimination toward any, to exercise

its discretion with complete good faith and honesty, and to avoid arbitrary

conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  Thus, as the Supreme Court

has held, a union "breaches the duty of fair representation when its conduct toward

a member of the bargaining unit is arbitrary, discriminatory, or in bad faith."

*Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998).

As relevant here, the Board has held that a union violates its duty of fair representation by failing to provide annual notice of *Beck* rights to unit employees covered by a union-security agreement who are not members of the union. *California Saw*, 320 NLRB at 230.   The Board further explained that "in order to fully inform non-member employees of their *Beck* rights, a union must [also] tell them ... of their *General Motors* rights to be and remain nonmembers."  *Id.* at 235; *accord In Re. L. D. Kichler Co.*, 335 NLRB 1427, 1430 (2001).

### C.    NMDU Breached Its Duty of Fair Representation to the Unit Employees It Represents at C&S and the Post

There is no dispute that the relevant collective-bargaining agreements here contain union-security clauses.  (SPA 49; A. 591, S.A. 71.)  Nor is there any dispute that NMDU failed to produce any evidence that it provided the necessary annual notices to Post employees beyond a one-time notice in a 2003 in-house bulletin.  NMDU concedes as much.  (Br 31: "Respondent concedes that notice was not given in later bulletins.")  Further, NMDU failed to offer testimony establishing that the 2003 bulletin remained posted at the facility for any period of time, particularly during 2009 when many employees, through hiring and group elevating, became new members of NMDU and therefore subject to the union-security clause in the 2003 NMDU-Post agreement.  NMDU failed to produce any witnesses who testified that, as a matter of course or standard operating procedure, NMDU informed Post employees of their *General Motors/Beck* rights before they

become subject to the obligations of the contractual union-security provisions.

Under these circumstances, the Board reasonably determined (SPA 49) that

NMDU breached its duty of fair representation by failing to inform Post members

and unit employees of their rights under *General Motors/Beck*.  The Board's

conclusion under these facts is eminently reasonable.  *See California Saw*, 320

NLRB at 231.

The Board also determined (SPA 49) that NMDU failed to inform C&S

employees of their *General Motors/Beck* rights.  In response to the General

Counsel's subpoena, "NMDU did not produce *any* notices" (SPA 49; emphasis

added), so the Board reasonably drew an adverse inference that NMDU never

informed C&S employees of their *General Motors/Beck* rights.  (SPA 49.)

Further, three C&S employees testified that they had paid agency fees but *never*

received notice from NMDU concerning *Beck/General Motors* rights.  (SPA 49.)

The Board's conclusion that NMDU failed to inform C&S employees is reasonable

and well supported.  *See California Saw*, 320 NLRB at 231.

NMDU's countervailing arguments are wholly meritless.  First, its

contention (Br. 32) that the General Counsel's failure to elicit evidence regarding

NMDU's expenses warrants non-enforcement of the Board order is incorrect.  *See*

*E.J. Brach Corp*., 324 NLRB 1193, 1994 (1997) ("[T]he General Counsel need not

prove a diversion of nonmember dues to nonrepresentational activities in order to

prove a union's unlawful failure to provide initial notice of *Beck* rights to nonmember unit employees."). Further, NMDU's unsupported reliance (Br. 33) on Section 8(c) of the Act (29 U.S.C. § 158(c)) wrongly and confusingly equates *Beck* notices with threats and misunderstands the purpose of Section 8(c). That section provides that, "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefits." 29 U.S.C. § 158(c). *Beck* notices are informative, objective notifications regarding employee rights; they are decidedly not threats. Moreover, the cited evidentiary rule has no bearing on whether NMDU fulfilled its obligation to provide *Beck* notices. Therefore, NMDU has provided no basis to disturb the Board's finding concerning NMDU's failure to inform employees of their *General Motors* and *Beck* rights.

## CONCLUSION

For the foregoing reasons, the Board respectfully submits that the Court should enter judgment enforcing the Board's Order in full and denying the petition for review.

Respectfully submitted,

/s/ Jill A. Griffin
JILL A. GRIFFIN
*Supervisory Attorney*

/s/ Barbara A. Sheehy
BARBARA A. SHEEHY
*Attorney*

National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570
(202) 273-2949
(202) 273-0094

RICHARD F. GRIFFIN, JR.
        *General Counsel*
JENNIFER ABRUZZO
        *Deputy General Counsel*
JOHN H. FERGUSON
        *Associate General Counsel*
LINDA DREEBEN
        *Deputy Associate General Counsel*

June 2015

# ADDENDUM

## Section 7

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) [section 158(a)(3) of this title].

## Section 8(a)(3) (29 U.S.C. § 158(a)(3))

It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [subchapter], or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act [in this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [section 159(a) of this title], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [section 159(e) of this title] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

## Section 8(b)(1)(A) (29 U.S.C. § 158(b)(1)(A))

It shall be an unfair labor practice for a labor organization or its agents--
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in

section 7 [section 157 of this title]: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein.

## Section 8(b)(2) (29 U.S.C. § 158(b)(2))

It shall be an unfair labor practice for a labor organization or its agents--to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) [of subsection (a)(3) of this section] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

## Section 8(c) (29 U.S.C. § 158(c))

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act [subchapter], if such expression contains no threat of reprisal or force or promise of benefit.

## Section 10(a) (29 U.S.C. § 160(a))

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

## Section 10(b) (29 U.S.C. § 160(b))

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or

agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six- month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of title 28, United States Code [section 2072 of title 28].

## Section 10(c) (29 U.S.C. § 160(c))

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further,* That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the

opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

## Section 10(e) (29 U.S.C. § 160(e))

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions

of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

## Section 10(f) (29 U.S.C. § 160(f))

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | * | |
| | * | |
| Petitioner | * No. 14-3978-ag | |
| | * | |
| v. | * | |
| | * Board Case No. | |
| NEWSPAPER AND MAIL DELIVERERS' UNION | * 2-CB-21740 | |
| OF NEW YORK AND VICINITY | * | |
| | * | |
| Respondent | * | |
| | * | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the Board

certifies that its brief contains 13,979 words of proportionally-spaced, 14-point

type, and the word processing system used was Microsoft Word 2007.


s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570
(202) 273-2960


Dated at Washington, DC
this 5th day of June, 2015

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD | * |
| | * |
| Petitioner | * No. 14-3978-ag |
| | * |
| v. | * |
| | * Board Case No. |
| NEWSPAPER AND MAIL DELIVERERS' UNION | * 2-CB-21740 |
| OF NEW YORK AND VICINITY | * |
| | * |
| Respondent | * |
| | * |

## CERTIFICATE OF SERVICE

I hereby certify that on June  5, 2015, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the

Second Circuit by using the appellate CM/ECF system.

I certify foregoing document was served on all those parties or their counsel

of record through the CM/ECF system if they are registered users or, if they are not

by serving a true and correct copy at the address listed below:

> Daniel A. Silverman
> Law Office of Daniel Silverman, LLP
> 52 3rd Street
> Brooklyn, NY 11231

> s/Linda Dreeben
> Linda Dreeben
> Deputy Associate General Counsel
> National Labor Relations Board
> 1099 14th Street, NW
> Washington, DC 20570
> (202) 273-2960

Dated at Washington, DC
this 5th day of June, 2015